KEARSE, Circuit Judge:
 

 Defendant Yassem Pares, a Lebanese national who was deported from the United States in 1990, appeals from a final judgment of the United States District Court for the Eastern District of New York, convicting him, following a jury trial before Gerald E. Rosen,
 
 Judge
 

 **
 
 , of unlawful reentry into the United States, in violation of 8 U.S.C. § 1826(a) (1988 & Supp. II 1990). Fares was sentenced principally to six months’ imprisonment, to be followed by a one-year term of supervised release. On appeal, he contends principally that the 1990 order of deportation was an invalid basis for his conviction because the immigration law judge (“IU”) who entered that order did not adequately inform him of his right to appeal from the deportation decision or of the “ramifications” of voluntary departure as an alternative to deportation. Fares also contends that in the present case he is the victim of selective prosecution and that the district court erred in denying his motion to dismiss on that ground without further discovery and an evidentiary hearing. For the reasons below, we reject Fares’s contentions and affirm the judgment.
 

 I. BACKGROUND
 

 Fares entered .the United States in November 1988 on a student visa, with the stated purpose of attending college in Staten Island, New York. His visa authorized him to remain so long as he was a student. However, he never enrolled in college in the United States. As detailed below, he was deported in 1990 after his continued presence as a nonstudent apparently had come to the attention of the Immigration and Naturalization Service (“INS”) as a result of New York State assault charges filed against him in late 1989.
 

 A.
 
 Fares’s Deportation from the United States in 1990
 

 On December 6, 1989, Fares, his brother Malik, and a cousin became involved in a verbal confrontation with employees of a New York City municipal agency, leading to the ejection of Fares and his companions from the agency offices. Outside, the exchange escalated into a physical altercation, during which Malik slashed two of the agency employees with a knife, while Fares himself used a cane to beat another employee unconscious. One victim reported that during these events Fares and his companions made statements indicating that they were connected with “Hizballah,” a Lebanese terrorist organization. Fares, Malik, and their cousin were apprehended and arrested on state charges of felonious assault.
 

 On December 8, 1989, INS issued a warrant for Fares’s arrest, seeking his deportation on the ground that he had been admitted on a student visa and was not a student. INS also sought to deport Malik and the cousin on like grounds. Fares, arrested later that day, signed a sworn statement conceding that he had never registered for school. He said he had not become a student because he had no money and had instead supported himself by working as a street peddler.
 

 Prior to the deportation hearing, negotiations were held between INS and the attorney representing Fares and his companions as to the possibility of having the case disposed of by their voluntary departure from the United States. INS imposed several conditions on its offer of voluntary departure, however, including the conditions that Fares
 
 et at.
 
 bear the expense of their departures and go to a country other than Canada. Fares and his companions rejected the offer, indicating their intention instead to seek political asylum.
 

 On February 9, 1990, IU Howard Cohen held a deportation hearing, at which Fares and his companions appeared
 
 pro se.
 
 Advised by the IU that they were entitled to
 
 *55
 
 counsel, and shown a list of available attorneys, Fares and his corespondents stated that they preferred to represent themselves. They also said they had changed their minds about seeking asylum because they could not find an attorney to represent them in that endeavor. After stating that they did not wish to make any further attempt to get a lawyer because returning to Lebanon seemed preferable to remaining in jail in the United States, the following exchange took place between the defendants and the IU:
 

 JUDGE: ____ Now let the record show that an off the record discussion of some length was held by and between government attorney and the aliens through the interpreter and the aliens were explained that they have the right to apply for voluntary departure from the United States meaning that they will pay their own way out of the United States and after a discussion they decided that they would rather not and that they would just take orders of deportation to Lebanon. Is that correct?
 

 DEFS: Yes it’s correct.
 

 KHEIR [interpreter]: Yes it took place. JUDGE: And you’re accepting orders of deportation to Lebanon as final in your case with no appeal?
 

 DEFS: Yes, we do.
 

 JUDGE: By all three?
 

 DEFS: Yes.
 

 KHEIR: [Y]es.
 

 JUDGE: Ok, very well. Final all three. (February 9, 1990 Deportation Hearing Transcript (“Tr.”) at 5-6.)
 

 An order for Fares’s deportation was entered on February 9, 1990. The order stated that Fares had waived his right to appeal from the deportation decision. By letter dated February 14, 1990, INS sent Fares formal notice of the deportation order; the letter included a warning that, should he ever wish to return to the United States, Fares would have to obtain permission from INS or an American Consular Office to return, and that if he returned within five years without permission, he could be prosecuted for violating 8 U.S.C. § 1326. Fares was deported to Lebanon on March 12, 1990. The state assault charges against him had been dismissed in anticipation of his deportation.
 

 B.
 
 The Arrest and Trial of Fares in the United States in 1991
 

 In February 1991, agents of the Federal Bureau of Investigation (“FBI”), upon examining certain surveillance photos taken in Brooklyn, New York, discovered that Fares had reentered the United States. He was arrested by FBI and INS agents in April 1991. Upon his arrest, Fares claimed to have reentered using a valid passport. After disclosure that he had no such passport, he was charged in a one-count indictment with having reentered the United States without permission after having previously been deported, in violation of 8 U.S.C. § 1326(a).
 

 Prior to trial, Fares, represented by assigned counsel, moved to dismiss the indictment on the grounds (1) that his 1990 deportation could not form a proper predicate for the present prosecution because his due process rights had been violated by,
 
 inter alia,
 
 the failure of the IU to advise him of his rights; and (2) that the present prosecution was brought because of his membership in Hizballah and thus violated his First Amendment rights and his right to be free of selective prosecution. As discussed in greater detail below, District Judge Carol B. Amon, to whom the case was initially assigned, denied both motions.
 

 In August 1991, Fares was tried before Judge Rosen and a jury. The' jury found Fares guilty of unlawfully reentering the United States after having been deported, in violation of § 1326(a). Judge Rosen sentenced him as indicated above, and this appeal followed.
 

 II. DISCUSSION
 

 On appeal, Fares principally renews his contentions that (1) the 1990 deportation order may not be used as a basis for the present prosecution because that order violated his right to due process, and (2) that the district court should have dismissed the indictment on the ground of selective pros
 
 *56
 
 ecution or at least should have ordered discovery and a hearing. For the reasons below, we find no basis for reversal.
 

 A.
 
 The 1990 Deportation Order as a Basis for Prosecution
 

 Fares contends that the 1990 deportation order constitutes an invalid basis for his conviction under 8 U.S.C. § 1326(a) because the IU did not adequately inform him of (a) his right to appeal from the deportation decision or (b) the desirability of voluntary departure as an alternative to deportation. The district court concluded that Fares had been adequately informed as to both the voluntary departure option and the right to appeal, and that any flaw in the information given him was not prejudicial. Though we conclude that Fares may not have had his right to appeal adequately explained, thereby giving him the right to challenge the order of deportation collaterally in this prosecution, we also conclude that he is not entitled to have the deportation order invalidated because the record does not indicate that he was prejudiced by deprivation of his right to appeal.
 

 1.
 
 The Availability of Collateral Review
 

 In general, where a determination in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be available some meaningful review of the administrative proceeding.
 
 See, e.g., United States v. Mendoza-Lopez,
 
 481 U.S. 828, 837-38, 107 S.Ct. 2148, 2154-55, 95 L.Ed.2d 772 (1987);
 
 Estep v. United States,
 
 327 U.S. 114, 121-22, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946). In the deportation context, this principle is reflected in federal regulations requiring that an alien threatened with deportation be given written notice that he has a right to appeal.
 
 See
 
 8 C.F.R. § 242.1(c) (1992) (respondent served with order to show cause “shall be furnished with ... a copy of Form 1-618, Written Notice of Appeal Rights”);
 
 see also id.
 
 § 242.16(a) (IU required to ascertain from alien at deportation hearing that he has received such notice). Though an alien may waive his right to appeal, any such waiver must be considered and intelligent.
 
 See United States v. Mendoza-Lopez,
 
 481 U.S. at 840, 107 S.Ct. at 2156-57;
 
 see generally Johnson v. Zerbst,
 
 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (effective waiver is an “intentional relinquishment or abandonment of a known right or privilege”).
 

 In
 
 United States v. Mendoza-Lopez,
 
 the Supreme Court established that where defects in the deportation proceeding have effectively foreclosed direct judicial review of the deportation order, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish deportation conclusively as an element of a § 1326 offense:
 

 Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.
 

 481 U.S. at 839, 107 S.Ct. at 2155. Thus,
 

 a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review____
 

 Id.
 
 In
 
 Mendoza-Lopez,
 
 the Court ruled that such a collateral attack could be made by aliens who had effectively been denied direct appeal because they were not given proper notice of the right to appeal.
 
 Id.; see also United States v. Proa-Tovar,
 
 975 F.2d 592, 594 (9th Cir.1992) (en banc),
 
 vacating,
 
 945 F.2d 1450 (9th Cir.1991);
 
 United States v. Holland,
 
 876 F.2d 1533, 1536 (11th Cir.1989).
 

 The record in the present case presents a close question as to whether or not Fares was adequately advised of his right to appeal. There is no documentary evidence that Fares was given written notice of that right as required by 8 C.F.R. § 242.-1(c); and the record does not indicate that the IU inquired, as required by
 
 id.
 
 § 242.-16(a), whether Fares had received such
 
 *57
 
 written notice. Nor did the ILJ state directly that Fares had the right to appeal. The only on-the-record mention of that right was a seemingly casual reference at the end of a question: “And you’re accepting orders of deportation to Lebanon as final in your case with no appeal?” Standing alone, such a reference is an insufficient basis on which to premise a finding that Fares understood he had a right to appeal or a finding that he intelligently and intentionally waived that right. We therefore entertain this collateral attack on the 1990 deportation order.
 

 2.
 
 The Merits of the Challenge
 

 The question remains whether Fares is entitled to have the 1990 deportation order invalidated solely on the ground that he was not properly advised of his right to appeal, or whether in addition he must show that he was prejudiced by that defect. This question was not explicitly answered by
 
 Mendoza-Lopez,
 
 despite the facts that the Court (a) found not only (1) that the aliens had been effectively deprived of their right to appeal, but also (2) that they had been “deprived of ... any basis to appeal since the only relief for which they would have been eligible was not adequately explained to them,” 481 U.S. at 842, 107 S.Ct. at 2157, and (b) ruled that the deportation order before it therefore could not validly be the basis for a § 1326 prosecution. The matter of whether that second deprivation was essential to the invalidation of the deportation order is obscured because of the unusual procedural posture in which the question was presented to the
 
 Mendoza-Lopez
 
 Court. The government had “asked th[e] Court to assume that respondents’ deportation hearing was fundamentally unfair,”
 
 id.
 
 at 839, 107 S.Ct. at 2156, and the Court acceded to that request, “accepting]” the lower court’s legal conclusion “that the deportation hearing violated due process,”
 
 id.
 
 at 840, 107 S.Ct. at 2156. Thus, the Court in effect assumed the existence of prejudice without explicitly addressing whether a showing of prejudice was required.
 

 The discussion in
 
 Mendoza-Lopez,
 
 however, suggests that for a collateral challenge to a deportation order to be successful, the alien must show not only that he was effectively deprived of his right of direct appeal, but also that the administrative proceedings were fundamentally unfair in some respect that would have entitled him to relief on direct appeal. The Court did not suggest that deprivation of judicial review alone was dispositive; rather, it stated that “where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available
 
 before
 
 the administrative order may be used to establish conclusively an element of a criminal offense,”
 
 id.
 
 at 838, 107 S.Ct. at 2155 (emphasis added). The implication is that if collateral judicial review reveals that there was no fundamental flaw other than the denial of a direct appeal, the deportation order may then be used to ground a criminal prosecution.
 

 We are persuaded that if an alien has been effectively denied his right of direct appeal from the deportation order, we should examine the underlying proceedings to determine whether or not he was unfairly prejudiced by those proceedings. If we find no fundamental unfairness, and we therefore conclude that a fully informed exercise of the right of direct appeal would have yielded the alien no relief from deportation, the deportation order may be used to establish conclusively an element of a criminal offense.
 
 Accord United States v. Proa-Tovar,
 
 975 F.2d at 595 (en banc);
 
 United States v. Holland,
 
 876 F.2d at 1536;
 
 United States v. Palacios-Martinez,
 
 845 F.2d 89, 91-92 (5th Cir.),
 
 cert. denied,
 
 488 U.S. 844, 109 S.Ct. 119, 102 L.Ed.2d 92 (1988);
 
 United States v. Polanco-Gomez,
 
 841 F.2d 235, 237 (8th Cir.1988).
 

 Fares contends that he was prejudiced by the ILJ’s failure to explain adequately the legal ramifications of voluntary departure as an alternative to deportation, in particular the fact that reentry without permission after deportation could expose the alien to a felony prosecution, whereas reentry without permission after voluntary
 
 *58
 
 departure would not. This does not satisfy the prejudice requirement. Though the regulations require the IU, at the hearing, to advise the alien of his right to counsel and of the availability of free legal services, and of such procedural matters as his right to examine and object to the government’s evidence against him and to cross-examine. the government’s witnesses, nothing in the statutes or regulations requires the IU to give the alien substantive legal advice. Thus, Fares was not unfairly prejudiced by any failure of the IU to suggest to him that if he reentered the United States without permission after a voluntary departure, he could not be prosecuted for a felony under § 1326, but only for a misdemeanor under 8 U.S.C. § 1325 (1988 & Supp. Ill 1991). Nor would the record support a contention that the IU in the present case had failed to advise that voluntary departure was in fact ah alternative or that Fares was disadvantaged by not knowing that such an alternative existed. Prior to the deportation hearing, Fares and his companions, represented by counsel, had negotiated for voluntary departure in lieu of deportation. Plainly they understood that this was an option and was in some ways preferable to deportation; the record shows that they rejected the voluntary departure option because the government placed certain conditions on its exercise. Further, at the hearing, the IU expressly noted that voluntary departure had been the subject of an off-the-record discussion “of some length”:
 

 [A]n off the record discussion of some length was held by and between government attorney and the aliens through the . interpreter and the aliens were explained that they have the right to apply for voluntary departure from the United States meaning that they will pay their own way out of the United States and after a discussion they decided that they would rather not and that they would just take orders of deportation to Lebanon.
 

 (Tr. 5-6.)
 

 On the basis of this record, we are persuaded that had Fares been adequately informed of his right of direct appeal from the deportation order, and had he exercised that right contending that he was not adequately informed with respect to the right of voluntary departure, the deportation order would have been upheld. Accordingly, we conclude that this collateral attack on the order is without merit. The 1990 deportation order was therefore a valid basis for the present prosecution.
 

 B.
 
 The Claim of Selective Prosecution
 

 In a motion filed shortly prior to his scheduled trial date, Fares pointed out that the government had opposed his earlier motion for bail by stating that it had information that Fares was a member of Hizballah, a terrorist organization, and he contended that he was being prosecuted because of his supposed membership in that organization. He also suggested that in the Eastern District of New York the government had prosecuted but one case under § 1326(a) in the past year. Fares argued that the prosecution thus violated his . First Amendment rights and his right to be free of selective prosecution. He requested discovery of “ ‘classified information’.” underlying the FBI claim that he was affiliated with Hizballah, an evidentiary hearing, and dismissal of the indictment.
 

 The government responded that it was prosecuting Fares because (1) the evidence that he had violated § 1326(a) was overwhelming, (2) the 1989 state assault charges against Fares had been dismissed only because he was to be deported, and (3) the FBI had identified him as someone affiliated with a terrorist organization. It presented evidence that during the preceding three years, it had prosecuted 13 other cases under § 1326(a) in the Eastern District of New York; and it represented that, in light of the dismissal of the state assault charges in contemplation of Fares’s deportation, it would have prosecuted him under § 1326(a) even had he not been identified as a member of a terrorist group. The court also received an affidavit from the government
 
 ex parte
 
 and
 
 in camera
 
 upon the government’s representation that public disclosure of the information contained in it could endanger the lives of several
 
 *59
 
 intelligence sources. That affidavit, from a detective who was a member of a joint state-and-federal anti-terrorist task force, indicated that prior to Fares’s arrest, the government had information from sources considered reliable that Fares had actively participated in Hizballah’s unlawful or terrorist activities.
 

 In an Opinion and Order dated November 20, 1991 (“November 1991 Opinion”), following both pre- and post-trial oral argument on the issue, Judge Amon denied this motion on the ground that Fares had not made a prima facie showing either that he had been singled out for prosecution from among others similarly situated, or that he had been selected for prosecution on an impermissible basis. The court reviewed the government’s evidence of past § 1326(a) prosecutions and concluded that, though such prosecutions might not be routine, “the prior assaultive conduct of the Defendant ] [was] sufficiently analogous to the convictions in the reviewed cases so as to defeat Defendants] claim[ ] of having been singled out for prosecution.” (November 1991 Opinion at 6.) The court also found that Fares had failed to present any basis for inferring that the present prosecution had been instituted solely on the basis of his membership in Hizballah. It concluded that the government had demonstrated its good faith belief in the accuracy of its information as to Fares’s unlawful conduct in connection with that organization and that the “prosecution[ ] [did] not represent invidious discrimination.”
 
 (Id.
 
 at 7.) We see no error in the district court’s rulings.
 

 We have held that in order to support a defense of selective prosecution, the defendant must make at least a prima facie showing both
 

 “(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant], he has been singled out for prosecution, and (2) that the government’s discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations .as race, religion, or the desire to prevent his exercise of constitutional rights.”
 

 United States v. Moon,
 
 718 F.2d 1210, 1229 (2d Cir.1983) (quoting
 
 United States v. Berrios,
 
 501 F.2d 1207, 1211 (2d Cir.1974)),
 
 cert. denied,
 
 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). With respect to the second element of this test, it is important to note that where we are concerned with the exercise of prosecutorial discretion, and “ ‘ “speech” and “nonspeech” elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.’ ”
 
 See, e.g., Wayte v. United States,
 
 470 U.S. 598, 611, 105 S.Ct. 1524, 1532, 84 L.Ed.2d 547 (1985) (quoting
 
 United States v. O’Brien, 391
 
 U.S. 367, 376, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968)). In such circumstances, “[t]he First Amendment confers no ... immunity from prosecution.”
 
 Id.
 
 at 614, 105 S.Ct. at 1534.
 

 To warrant discovery with respect to a claim of selective prosecution, a defendant must present at least “some evidence tending to show the existence of the essential elements of the defense and that the documents in the government’s possession would indeed be probative of these elements.”
 
 United States v. Berrios,
 
 501 F.2d at 1211-12;
 
 see also St. German of Alaska Eastern Orthodox Catholic Church v. United States,
 
 840 F.2d 1087, 1095 (2d Cir.1988). Mere assertions and generalized proffers on information and belief are insufficient.
 
 See United States v. Berrios,
 
 501 F.2d at 1211 (proffer stating that defendant and his attorney “ ‘believe’[d]” that “ ‘there [we]re hundreds’ ” of unprosecuted persons situated similarly to defendant was insufficient for lack of identification of any unprosecuted violators or affiliated organizations). The district court’s denial of a motion for discovery and a hearing on such a claim will not be overturned except for an abuse of discretion.
 
 See, e.g., id.
 
 at 1212. It is an abuse of discretion to grant a defendant’s motion for disclosure of confidential government documents unless they “would tend to establish
 
 *60
 
 the elements of his defense of selective and discriminatory prosecution.”
 
 Id.
 
 (vacating conditional dismissal order for failure to apply this standard).
 

 In the present case, we see no abuse of discretion in the denial of discovery and an evidentiary hearing and no error in the denial of Fares’s motion. Fares’s assertion that his was the only prosecution under § 1326(a) in the Eastern District of New York in a year was speculative and unduly myopic. The government’s records showed that there had been some 13 other such prosecutions in that district in the past three years, and the court was entitled to credit those records. Fares did not counter with evidence as to large numbers of similarly situated persons known to the government who had not been prosecuted. His selective prosecution claim thus lacks merit because he failed to show that he had been singled out.
 

 Further, even had he shown such selectivity, Fares’s claim was properly rejected because he could not show that the government’s decision to prosecute him was invidious or made in bad faith.' The state assault charges against Fares had been dismissed only because of his impending deportation. His subsequent return to the United States after thereby avoiding prosecution on those charges provided the government with more than a sufficient good faith basis for prosecuting Fares. The government’s affidavit concerning Hizballah and Fares’s association with it merely provided the government with an additional reason for prosecuting Fares. It therefore was well within the discretion of the district court to deny Fares’s discovery request.
 

 CONCLUSION
 

 We have considered all of Fares’s arguments on this appeal and have found no basis for reversal. The judgment of conviction is affirmed.
 

 **
 

 Honorable Gerald E. Rosen, Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.