**UNITED STATES of America**

v.

**Evan BROWN, Defendant.**

**No. CR–00–0168CPS.**

United States District Court,
E.D. New York.

Jan. 17, 2001.

---

Jan A. Rostal, Legal Aid Society, Brooklyn, NY, for Defendant.

Wayne Baker, U.S. Atty's Office, Brooklyn, NY, for U.S.

## MEMORANDUM AND ORDER

SIFTON, Senior District Judge.

Defendant Evan Brown is charged with illegal reentry into the United States following a previous removal pursuant to law, in violation of 8 U.S.C. § 1326(a) & (b)(2).

On November 8, 2000, defendant moved pursuant to Federal Rule of Criminal Procedure 12(b)(2) and the Fifth Amendment to the United States Constitution to dismiss the indictment against him, arguing that the removal order underlying the in-

stant charge was invalid because he was not afforded an opportunity to depart from the country voluntarily. The government argues that there was no infirmity in the underlying removal procedure and that Brown may not collaterally attack his original removal order.

For the reasons set forth below, defendant's motion to dismiss the indictment is granted.

## BACKGROUND

The following facts are drawn from the submissions of the parties in connection with the instant motion. Material disputes are noted.

In September 1991, Brown, a citizen of Ghana, was convicted in Thailand of conspiracy to import narcotics and sentenced to thirty months in prison. Upon his release in May 1994 from prison in Thailand, Brown was extradited to the United States to be prosecuted for conspiracy to import narcotics into the United States in violation of 21 U.S.C. § 963. On May 27, 1994, after being received into the custody of the Immigration and Naturalization Service ("INS") pursuant to the extradition warrant, Brown was paroled into the United States pursuant to § 212(d)(5) of the Immigration and Naturalization Act, 8 U.S.C. § 1182(d)(5),[1] in order to permit his appearance to confront the charges against him. According to INS Agent Stanley

---

1. 8 U.S.C. § 1182(d)(5) reads in relevant part: The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney Gener-

al, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States. 8 U.S.C. § 1182(d)(5)(A); *see also Matter of Badalamenti*, 19 I. & N. Dec. 623, 626 (B.I.A. 1988) ("It is clear from the legislative history of this provision that Congress intended to empower the Attorney General to parole an alien for the purpose of prosecution.").

Stedman, Brown's period of parole was scheduled to expire on May 26, 1995; Brown claims that he was never informed when his period of parole would expire.

On November 14, 1994, Brown pled guilty in the United States District Court for the District of New Jersey to one count of conspiracy to import heroin in violation of 21 U.S.C. § 963 and remanded to the custody of the Bureau of Prisons to serve a sentence of 60 months' imprisonment to be followed by five years of supervised release.

On April 21, 1998, following the completion of his federal prison sentence and while in the custody of the INS in Oakdale, Louisiana, Brown was served with a letter from the INS informing him of his right, recognized by the INS in *Matter of Badalamenti*, 19 I. & N. Dec. 623, 626 (1988), to make preparations to leave the United States voluntarily within 30 days (the "*Badalamenti* letter"). According to the letter, if Brown was able to obtain "a nonrefundable airline ticket with an open departure date and a valid Travel Document (Passport or Emergency Travel Permit) to Ghana," (Def.'s Mot. Ex. B.), he would be allowed to depart voluntarily; otherwise, removal proceedings would commence and he would be ordered removed. Upon receipt of this letter, Brown indicated in the manner provided by the letter that "I, Evan Owens Brown, do wish to return to Ghana at my own expense." (*Id.*) The government does not dispute that, because Brown was in custody, his passport and money were in the possession of the government when the *Badalamenti* letter was delivered. Brown plausibly claims that he expected the government to assist him in leaving the country voluntarily since both his passport and the funds required to

obtain the airline ticket were in the possession and under the control of the government.

On the same day on which he received the *Badalamenti* letter, April 21, 1998, Brown was also served with a notice dated April 17, 1998, to appear for a removal proceeding. This notice informed Brown that he was "an arriving alien" and charged that he was subject to removal. (Def.'s Mot. Ex. A.)[2]

On April 27, 1998, six days after Brown received the *Badalamenti* letter, Brown received notice of a hearing date, May 13, 1998, regarding the removal proceedings. On this date, which, like the notice, was prior to the expiration of the thirty day period, Immigration Judge Agnelis L. Reese held a hearing and ordered Brown removed to Ghana. Brown appeared at this hearing without an attorney.

At the hearing, the judge informed Brown of the charges against him, namely that Brown was a citizen of Ghana and not the United States, that Brown was extradited and paroled for "humanitarian reasons" into the country, and that he was convicted of the offense for which he was incarcerated. The immigration judge then informed Brown that "[t]here is no relief that is available to you under present immigration law. So I am going to order that you be removed from the United States to Ghana. Now if you agree with that decision you can accept it, if you disagree with it you would have thirty days to appeal it. What would you like to do?" (05/13/99 Hearing, at 5.) Brown responded that he accepted the immigration judge's decision and did not want to appeal. Brown then asked the immigration judge, "How will you assist me to facilitate

---

**2.** 8 U.S.C. § 1229(a) provides that a removal proceeding shall be "initiat[ed]" by service of a notice to appear that contains the information substantially contained in the April 17, 1998 notice to appear delivered to Brown.

my removal as quickly as possible?" (*Id.* at 6.) The immigration judge responded that an INS officer would contact Brown within the week. No mention was made at Brown's removal hearing by either the immigration judge or the INS attorney of Brown's right to depart voluntarily. Brown states that he believed that an immigration officer would assist him to depart voluntarily after the removal hearing was completed.

Following the hearing, Brown was removed from the United States on either November 17, or December 29, 1998; the government's exhibit 10 to its memorandum of August 8, 2000, contradicts its exhibit 11 in this regard.

Over a year after Browns's removal, on February 9, 2000, he appeared at John F. Kennedy International Airport ("JFK") and presented a Nigerian passport and a transportation letter issued at the United States Embassy in Banjul, the Gambia, that indicated that he was a lawful permanent resident named Henry Cosmas Ikemefuna Ofodili Uwakonye, a citizen of Nigeria. The INS reviewed the photograph and fingerprint indices of Uwakonye and determined that defendant's appearance and fingerprints did not match those of Uwakonye. Thereafter, defendant stated that he was not Henry Cosmas Ikemefuna Ofodili Uwakonye but was Cosmas Ofodili Uwakonye, the man's cousin, to whom he claimed to have sold his identity in 1993. Later in the same day, fingerprint test results established that the individual claiming to be Cosmas Ofodili Uwakonye was in fact Evan O. Brown. When confronted with this information, defendant admitted his identity, that he had been previously incarcerated, and thereafter left the United States. Brown states that he returned to the United States to collect approximately the $1,500 he earned while

incarcerated that had not been used for his plan ticket to Ghana.

On April 20, 2000, Brown pled guilty before the undersigned to one count of illegal reentry in violation of 8 U.S.C. § 1326(a) & (b)(2). Defendant was thereafter scheduled to be sentenced on June 30, 2000, at which point he requested leave to withdraw his guilty plea. By memorandum and order dated November 6, 2000, as amended by decision and order dated November 16, 2000, this Court granted Brown's motion to withdraw his guilty plea.

On November 8, 2000, Brown moved this Court pursuant to Federal Rule of Criminal Procedure 12(b)(2) and the Fifth Amendment to the Constitution to dismiss the indictment against him. Brown argues that the removal order underlying the instant charge was invalid because (1) Brown's parole was not properly terminated because he did not receive notice of the termination of his parole and because he was not returned to the custody from which he was paroled, and (2) he was not afforded a reasonable opportunity to depart voluntarily from the United States.

## DISCUSSION

 Because prior removal or deportation is an essential element of the offense of illegal reentry, an indictment charging illegal reentry under 8 U.S.C. § 1326 must be dismissed under Federal Rule of Criminal Procedure 12(b)(2) if the underlying removal was illegal. *See United States v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). Collateral review of the validity of an underlying deportation order is appropriate in limited circumstances, however. Under § 1326(d), collateral attack on an underlying removal order is permitted only if:

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).[3] Under controlling case law, a defendant charged with illegal reentry can succeed in a challenge to an underlying removal order only if he can show, first, that "the defects in the deportation proceeding effectively deprived him of his right to appeal that determination directly" and, second, that "he was prejudiced by the deprivation ·of his right to appeal." *United States v. Paredes–Batista,* 140 F.3d 367, 378–79 (2d Cir.1998). To establish prejudice, a defendant must show either that " 'a fully informed exercise of his right of direct appeal would have yield-ed [him] ... relief from deportation' " or that the deportation proceeding was so " 'fundamentally unfair' in some respect that the alien would have been entitled to relief on direct appeal." *Id.* at 378 (quoting *United States v. Fares,* 978 F.2d 52, 57 (2d Cir.1992)).[4]

### *Alleged Defects in Removal Proceedings*

Brown alleges two defects in the proceeding that led to his removal from the United States. First, Brown argues that his parole was improperly terminated because he did not receive notice of such termination and because he was not returned to the custody from which he was paroled. Second, Brown claims that he was not afforded a reasonable opportunity to depart voluntarily from the United States.

### *Termination of Parole*

After his extradition, Brown was admitted into the United States pursuant to 8

---

**3.** Section 1326 was amended in 1996 to include subsection (d), quoted in the text, which addresses collateral review. Prior to the 1996 amendments effected by the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132 § 441, 110 Stat. 1214, 1279 (1996), Section 1326 included no specific guidelines regarding collateral review of deportation orders.

**4.** *Paredes–Batista* and *Fares,* upon which the *Paredes–Batista* court relied, interpreted *Mendoza–Lopez,* the Supreme Court decision that first established, on due process grounds, a defendant's right to collaterally challenge an underlying deportation order. The *Mendoza–Lopez* decision, as well as *Paredes–Batista* and its other progeny, considered § 1326 before the 1996 amendments took effect. The amendments to § 1326 do not, however, alter the standard set forth in *Paredes–Batista* or *Mendoza–Lopez.* While § 1326 includes an additional enumerated requirement, namely, that "the alien [must have] exhausted any administrative remedies that may have been available," this requirement adds little of substance because the Second Circuit re-quirement that a defendant show that he was "deprived ... of his right to appeal" contemplates both administrative and judicial appeals, if only as a matter of necessity. In the context of a removal proceeding, judicial review is only possible after administrative remedies have been exhausted. *See* 8 C.F.R. § 3.38 (directing appeals from decisions of immigration judges to the Board of Immigration Appeals (the "BIA")); 8 U.S.C. § 1252(b) (directing appeals from the BIA to courts of appeals). Thus, the enactment of § 1326(d) does not alter the analysis set forth in *Paredes–Batista* and Mendoza–Lopez; it simply elaborates upon it. The government concedes as much, *see, e.g.,* Gov't Mem. Opp. of 08/08/00, at 11–12 ("[The *Mendoza–Lopez* ] language mirrors the statute itself .... The question, then, is whether the proceedings were fundamentally unfair."). In any event, a conclusion that Congress did not intend to alter the substantive showing required to collaterally attack an underlying removal order is warranted if only to avoid the constitutional issues that would be raised if Congress attempted to alter the requirements of *Mendoza–Lopez* and its progeny.

U.S.C. § 1182(d)(5)(A), which permits the Attorney General to parole aliens into the United States for, among other purposes, prosecution. *See Badalamenti,* 19 I. & N. Dec. at 626. Under 8 C.F.R. § 212.5(d),[5] the parole of an alien may be terminated only upon notice, pursuant to § 212.5(d)(2), or without notice at "the expiration of the time for which parole was authorized" when parole was initially granted, pursuant to § 212.5(d)(1). In either event, the alien must be "returned to the custody from which he was paroled" when his parole is terminated. 8 U.S.C. § 1182(d)(5)(A).

█ The parties agree that defendant was not afforded notice of the termination of his parole but dispute whether notice was required. Defendant claims that he was never informed of the date on which his parole was scheduled to expire and that subsection (d)(2) therefore applies, with its requirement of notice. The government asserts that the date on which Brown's parole was scheduled to expire was determined upon Brown's parole into the country to be May 26, 1995, and that subsection (d)(1), which does not require notice, properly applies.

Defendant's position in this regard must be rejected. According to Agent Stedman, the standard practice of the INS is to determine a parole termination date when an alien's period of parole commences. This date is recorded on an "I–94 card." Following an alien's removal from the United States, the alien's I–94 card is destroyed; prior to its destruction, however, its material contents are transferred to the INS' electronic database. Agent Stedman states that this is the procedure that the INS followed in Brown's case, and a printout of the INS' electronic case file for Brown shows that Brown was admitted on May 27, 1994, and that the period of admission terminated on May 26, 1995. Defendant's contention that he was never informed of the date his parole was scheduled to expire is not dispositive and, in any event, not credible in light of the INS' electronic records. Therefore, § 212.5(d)(1) applies, and the government was not required to notify Brown upon the termination of his parole.[6]

█ Defendant also contends that he was not "returned to the custody from which he was paroled," in violation of 8 U.S.C. § 1182(d)(5)(A). The custody from which Brown was paroled, according to defendant, is Thailand.[7] There is no basis

---

**5.** The subsection reads, in part:

(1) Automatic, Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (d)(2) of this section except that no written notice shall be required.

(2)(i) On notice. In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized ... parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole.

8 C.F.R. § 212.5(d).

**6.** In any event, it is unlikely that the government's failure to provide written notice to defendant of the termination of his parole, assuming it were required to so provide, would constitute fundamental unfairness of the type and degree that would permit collateral review of the removal proceedings. *See United States v. Ortiz–Diaz,* 849 F.Supp. 734, 738–39 (E.D.Ca.1994) (holding that putative failure to provide notice of termination of parole did not prejudice defendant so as to permit collateral attack in a § 1326 prosecution).

**7.** Defendant asserts on one occasion that the custody from which he was paroled was "the custody of the Thai authorities (or the law enforcement agency responsible for executing the extradition warrant)." (Rostal Decl.

in law, however, for defendant's apparent claim that he should have been returned to Thailand following the expiration of his parole. While there appears no helpful authority defining the phrase, "the custody from which he was paroled," it is clear that the INS properly retained custody of Brown following the termination of his parole and that retaining custody of him was not "fundamentally unfair." *See Ofosu v. McElroy*, 98 F.3d 694, 699 (2d Cir.1996) ("The INS may demand at any time that the alien return to [its] custody."). Thus, the termination of Brown's parole was handled in an appropriate manner.

### Reasonable Opportunity to Depart Voluntarily

██ An alien who is extradited and paroled into the United States for the purpose of prosecution does not automatically become an applicant for admission to the United States upon or prior to termination of his parole. *See Badalamenti*, 19 I. & N. Dec. at 626, 1988 WL 235450. Because such an alien is not, *per se*, an applicant for admission, he cannot be excluded or removed. *See id.; cf.* 8 U.S.C. § 1227 (setting forth conditions for removability of aliens).[8] Accordingly, barring evidence that the alien affirmatively seeks admission or is otherwise subject to removal, such an alien must be afforded "a fair and reasonable opportunity to depart" voluntarily before he becomes subject to removal proceedings. *Badalamenti*, 19 I. & N. Dec. at 626; *see also United States ex rel. Bradley v. Watkins*, 163 F.2d 328, 332 (2d Cir.1947) (holding that order under which

alien was to be deported after he was forcibly brought to the United States as a prisoner of war and deemed, contrary to the evidence, to be an applicant for admission, was entered "without jurisdiction" because alien had a right to depart voluntarily).

There is no evidence that Brown sought admission to the United States at any point or, as of the date of the removal proceedings, was in this country voluntarily. Accordingly, the government concedes that the INS was required to afford Brown a reasonable opportunity to depart the United States voluntarily prior to subjecting him to removal proceedings. The INS failed to afford him such an opportunity.

Employing a procedure that Brown credibly and understandably claims confused him, the INS delivered two documents to Brown on April 21, 1998. The first was the *Badalamenti* letter, which informed Brown that he had thirty days within which to produce an airline ticket to Ghana and a passport. Brown immediately stated in response to this letter that he wished to depart voluntarily. The second document was the notice to appear dated April 17, 1998, which charged that he was illegally in the country and subject to removal. Thus, Brown was informed at once that he had a right to depart voluntarily and to make preparations to do so within thirty days and that he had no such right and was subject to a removal proceeding.

Brown's removal hearing occurred on May 13, 1998, when Brown had eight days remaining within which to produce the necessary documents to depart voluntarily,

¶ 25.) Thus, defendant appears to contend that he should have been returned to either Thailand or this unnamed law enforcement agency, which presumably is not the INS since it was to INS custody that Brown was delivered following the termination of his parole. Because defendant does not specify to which agency he believes he should have been

returned, I construe his claim as one that he should have been returned to Thailand.

8. While *Badalamenti* concerned an exclusion proceeding rather than a removal proceeding, no one contends that this distinction is material to the instant dispute.

according to the *Badalamenti* letter. The hearing was attended by the immigration judge, an INS attorney, and Brown; Brown was not represented. At the hearing, the immigration judge informed Brown that no relief was available to him under immigration law. This advice was incorrect since he still had time to obtain the required documents, even assuming, without deciding, that the government had no obligation to assist him in recovering the money and passport to facilitate his voluntary departure. Immediately thereafter, the immigration judge ordered Brown removed and asked whether he wished to appeal. Brown responded that he did not and asked how the judge would assist him to facilitate his removal as quickly as possible. At no point during the hearing did the judge or the INS attorney advise Brown that by giving up his right to appeal he was waiving his right to depart voluntarily. Indeed, nothing was said on the subject of the right of voluntary departure which Brown had expressly invoked.

Brown's removal proceeding plainly violated the INS' own requirement, elaborated in *Badalamenti*, that aliens in Brown's circumstances be provided "a fair and reasonable opportunity to depart" voluntarily before a removal proceeding is initiated. 19 I. & N. Dec. at 626, 1988 WL 235450.

■ Brown's removal proceeding also violated due process because the procedural defects in the proceeding "impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause." *Rabiu v. INS*, 41 F.3d 879, 882 (2d Cir.1994) (internal quotation marks omitted) (holding that ineffective assistance of counsel at deportation hearing rendered the hearing fundamentally unfair in violation of the Due Process Clause).[9] Because Brown could not reasonably have been expected to understand that he was giving up his right to leave the country voluntarily by the procedures employed by the INS and the inquiry of the immigration judge, Brown was removed without due process of law. *See United States v. Mendoza–Lopez*, 781 F.2d 111, 113 (8th Cir.1985) (upholding district court finding of fundamental unfairness in violation of due process because defendants, who were unrepresented, did not understand that they were eligible for suspension of deportation and "did not understand the consequences of the choices that they were forced to make"), *aff'd*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987); *see also Boykin v. Alabama*, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (holding in criminal context that, " 'if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void.... [The plea] cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts' " (quoting *Johnson v. Zerbst*, 304 U.S. 458, 466, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938))).

*Deprivation of Right to Appeal*

Given that the removal proceeding underlying the instant charge of illegal reentry was defective, the question remains

9. *See also Mendoza–Lopez*, 481 U.S. at 839 n. 17, 107 S.Ct. 2148 ("We decline at this stage to enumerate which procedural errors are so fundamental that they may functionally deprive the alien of judicial review.... While the procedures required in an administrative proceeding are less stringent that those demanded in a criminal trial, analogous abuses [to those that establish fundamental unfairness in the criminal context] could operate, under some circumstances, to deny effective judicial review of administrative determinations."); *Rabiu*, 41 F.3d at 882 (finding fundamental unfairness in violation of due process at deportation hearing).

whether collateral review of that proceeding is permissible and whether the defects in the proceeding prejudiced defendant. The answer to each question is affirmative.

■ "In general, where a determination in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." *Fares*, 978 F.2d at 56. In *Mendoza–Lopez*, the Supreme Court held that "where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review," collateral review of the deportation proceeding is required by the Due Process Clause before the fact of deportation may serve as an element of a subsequent criminal conviction. 481 U.S. at 839, 107 S.Ct. 2148; *see also Fares*, 978 F.2d at 56 ("[W]here defects in the deportation proceeding have effectively foreclosed direct judicial review of the deportation order, an alternative means of obtaining judicial review must be made available.").

Here, Brown was advised by the immigration judge of his right to appeal her decision and was provided with a written document that explained his right to appeal. Brown chose not to avail himself of his right to appeal, instead accepting the judge's decision. Thus, the government argues, Brown was not barred from effective direct judicial review.

■ Under *Mendoza–Lopez*, any waiver of the right to appeal must, however, be considered and intelligent. *See* 481 U.S. at 840, 107 S.Ct. 2148 ("Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding."); *Mendoza–Lopez*, 781 F.2d at 113 (finding that *Mendoza–Lopez* defendants "did not understand the consequences of the choices that they were forced to make"); *see also Fares*, 978 F.2d at 56 ("effective waiver is 'intentional relin-

quishment or abandonment of a known right or privilege'" (quoting *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019)). Where an alien is deprived "of any basis to appeal since the only relief for which [he] would have been eligible was not adequately explained to [him]," *Mendoza–Lopez*, 481 U.S. at 842, 107 S.Ct. 2148, collateral review of the proceeding is appropriate.

Brown's waiver here was neither considered nor intelligent. The defects in the removal proceeding left Brown with no reason to believe that he had given up the right that he had invoked. Given that he misunderstood the nature of the proceeding, he likewise did not understand that he had "any basis to appeal," and his waiver of his right to appeal was neither considered nor intelligent.

Because Brown's waiver of his right to appeal was not considered and intelligent and because Brown did not comprehend the basis for an appeal, Brown was denied effective review of the removal proceeding. Therefore, collateral review of the removal proceeding is required by the Due Process Clause before the proceeding may be used as the basis for a criminal conviction.

### *Prejudice*

To establish actual prejudice from the errors in an underlying removal proceeding, a defendant must show either that "'a fully informed exercise of his right of direct appeal would have yielded [him] ... relief from deportation'" or that the deportation proceeding was so "'fundamentally unfair' in some respect that the alien would have been entitled to relief on direct appeal." *Paredes–Batista*, 140 F.3d at 378 (quoting *United States v. Fares*, 978 F.2d 52, 57 (2d Cir.1992)). These requirements derive from the statement of the *Mendoza–Lopez* Court that the aliens there at issue "were deprived of ... any basis to

appeal since the only relief for which they would have been eligible was not adequately explained to them." 481 U.S. at 842, 107 S.Ct. 2148; *cf. Fares,* 978 F.2d at 57–58 (setting forth above two-part test in light of *Mendoza–Lopez* Court's statement).

Brown has established that he was prejudiced by the denial of effective appellate review. First, "a fully informed exercise of his right of direct appeal" would have entitled Brown to relief from deportation. On direct appeal to the BIA, the removal order would in all likelihood have been vacated because the INS did not adhere to the BIA's *Badalamenti* requirements in Brown's removal proceeding. Moreover, Brown would have been entitled to relief from deportation if his removal proceeding was reviewed by the court of appeals because the removal proceeding was fundamentally unfair and violated due process.[10] Brown was "deprived of ... any basis to appeal," by the defects in the proceeding, and since he had a viable basis for appeal, he was prejudiced by that deprivation.

The present case is unlike other cases that have found no prejudice in the denial of an effective right to appeal. In *Paredes–Batista,* the defendant contended that his counsel at the deportation proceeding was constitutionally ineffective due to his failure to press the immigration judge for a voluntary departure. The court held that the defendant was not prejudiced because the request for a voluntary departure "would have been futile" in light of the defendant's criminal record. 140

F.3d at 378–79 (internal quotation omitted). In *Fares,* the defendant contended that he was prejudiced by the failure of the immigration judge "to explain adequately the ramifications of voluntary departure as an alternative to deportation." 978 F.2d at 57. Because the defendants, who were represented by counsel, "had negotiated for voluntary departure in lieu of deportation" prior to the deportation hearing and "[p]lainly [ ] understood that this was an option ... [and] rejected the voluntary departure option," because voluntary departure was the subject of a lengthy off-the-record discussion at the hearing itself and because the immigration judge was not required to provide the defendants with substantive legal advice regarding the possibility of a felony § 1326 charge in the event that the defendants were to reenter the country, the court determined that the deportation order would have been upheld on direct appeal.

Here, Brown's request for a voluntary departure would not have been futile had it been handled appropriately at the removal proceeding or addressed in an appeal. Brown's removal proceeding was fundamentally unfair, and he would have been entitled to relief had he made a fully informed exercise of his right to appeal. Therefore, Brown has established that he was prejudiced by the denial of his right to an effective appeal.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss the indictment

---

**10.** In *Paredes–Batista,* the Second Circuit noted that, where counsel at an underlying deportation proceeding was constitutionally ineffective, an alien "could claim to be prejudiced by the deprivation of his right to appeal, because such a due process violation would have been grounds for relief from his deportation order." 140 F.3d at 378. Brown cannot claim that his counsel was so ineffective as to impinge upon the fundamental fairness of the proceeding because Brown had no counsel at the proceeding. Nonetheless, given the myriad defects in the proceeding, as well as the fact that Brown was unrepresented at the time, it is apparent that the removal proceeding was fundamentally unfair in violation of due process.

against him is granted. Both the underlying indictment and the superseding indictment, each of which charge that Brown violated § 1326, are dismissed.

The Clerk is directed to furnish a filed copy of the within to all parties.

SO ORDERED.