**UNITED STATES of America,**

v.

**Richard GARCIA–JURADO, Defendant.**

**No. 02–CR–1439.**

United States District Court,
E.D. New York.

July 27, 2003.

Alphonzo Grant, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

### *MEMORANDUM AND ORDER*

TRAGER, District Judge.

Defendant Richard Garcia–Jurado ("Garcia–Jurado") is charged in a single-count indictment with illegally reentering the United States after deportation for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and § 1326(b)(2). Garcia–Jurado now moves to dismiss the indictment pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure and the Fifth Amendment, arguing that the underlying deportation was unlawful because he was improperly denied an opportunity to seek discretionary relief under § 212(c) of the Immigration and Naturalization Act ("INA").

### Background

Garcia–Jurado was born in Colombia on November 19, 1971. (Colson Aff. ¶ 4.) At the age of sixteen, he came to the United States as a legal permanent resident. (*Id.*) Garcia–Jurado's mother filed the petition on his behalf. (*Id.*) Garcia–Jurado's mother was a legal permanent resident at the time; she subsequently became a United States citizen in 1992. (*Id.*) Upon arrival, Garcia–Jurado lived with his mother, stepfather and half-sister. (*Id.* ¶ 5.) Both his stepfather and half-sister are United States citizens. (*Id.*) Shortly after his arrival, Garcia–Jurado's brother and older sister also emigrated to the United States as legal permanent residents. (*Id.* ¶ 6.) His older sister is now a United States citizen. (*Id.*)

Garcia–Jurado attended high school in the United States. (*Id.* ¶ 7.) He was also employed for a time in 1990 by a cleaning company in Westchester County, New York. (*Id.* ¶ 9.) Also in 1990, Garcia–Jurado began a long-term relationship with Maryiory Alzate, a legal permanent resident, with whom Garcia–Jurado had a daughter in August 1992. (*Id.* ¶ 8.)

On December 13, 1993, Garcia–Jurado pled guilty in Queens County Supreme Court to Criminal Possession of a Controlled Substance in the Third Degree. (*Id.* ¶ 10.) He was sentenced to four to twelve years in state prison. (*Id.*) In prison, he completed his GED and received two vocational training certificates. (*Id.*) In late 1995, the INS initiated deportation proceedings against Garcia–Jurado, charging him as deportable as a result of his 1993 conviction. (*Id.* ¶ 11.)

Garcia–Jurado was transferred to INS custody in February 1997, upon the completion of his state sentence. (*Id.* ¶ 16.) On March 31, 1997, he was released on a $15,000 bond pending the resolution of the deportation proceedings. (*Id.*) While out on bond, Garcia–Jurado worked as a machine operator for a company in Ossining, New York. (*Id.*) His bond remained in effect until he presented himself, as instructed, to the INS immediately prior to his deportation. (*Id.* ¶ 17.)

In an effort to avoid deportation, Garcia–Jurado's retained Glenn Bank, Esq. ("Bank"), who represented him throughout the deportation process. (*Id.* ¶ 12.) Bank

sent a letter to the INS on February 13, 1996 (prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996[1] ("AEDPA")) requesting a hearing before an immigration judge in Fishkill, New York. (*Id.* ¶ 12; *Id.*, Ex. J, at 6.) The hearing was held on July 23, 1996. At the hearing, Garcia–Jurado did not challenge his deportability, but indicated that he intended to apply for § 212(c) relief. (*Id.* ¶ 13.)

However, the immigration judge, in a written opinion, "pretermitted" the application for discretionary relief, finding that § 212(c) relief was not available to Garcia–Jurado. (*Id.* ¶ 14, Ex. K, at 2) The immigration judge cited the then recently-enacted AEDPA, as well as an Attorney General's ruling that AEDPA applied to all convictions and guilty pleas entered prior to the enactment of AEDPA regardless of whether the application for discretionary relief was pending when AEDPA was enacted.[2] (*Id.*)

Garcia–Jurado timely appealed to the Board of Immigration Appeals ("BIA"), and on July 2, 1997, the BIA dismissed Garcia–Jurado's appeal on the ground that he was ineligible for § 212(c) relief under AEDPA. (*Id.* ¶ 15, Ex. M.) Garcia–Jurado then filed a motion to reconsider before the BIA, which was opposed by the government. (*Id.*, Ex. N.) On October 16, 1997, while the motion for reconsideration was still pending before the BIA, Garcia–Jurado submitted himself to INS custody

as he was instructed. Garcia–Jurado then filed a request for an emergency stay of deportation, which was denied. (Bank Aff. ¶ 4.) On October 22, 1997, six days after presenting himself to the INS, he was deported to Colombia. (Colson Aff. ¶ 17.) On March 25, 1998, the BIA ordered that the motion to reconsider be withdrawn "by operation of law" because Garcia–Jurado had been deported. (*Id.* ¶ 18, Ex. U.)

On June 13, 2002, Garcia–Jurado was arrested in Queens, New York, for Criminal Possession of Marijuana. (Gov.'s Mem. at 3.) The INS interviewed Garcia–Jurado at the Rikers Island detention facility and determined that he had previously been deported. (*Id.*) The challenged indictment followed.

### Discussion

#### (1)

This case requires the untying of yet another legal knot that was formed in the wake of the enactment of AEDPA and the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 et. seq. (1996). Under the immigration laws, an alien that is convicted of certain crimes—known as aggravated felonies—is deportable. *See United States v. Copeland*, 228 F.Supp.2d 267, 270 (E.D.N.Y.2002) (Weinstein, J.) (citing 8 U.S.C. § 1227(a)(2)(A)(iii)). Prior to April 24, 1996, legal permanent residents who were deportable were, nonetheless, entitled to

---

1. Pub.L. No. 104–132, 110 Stat. 1214 et. seq. (1996).

2. Soon after the enactment of AEDPA, the BIA took the position that AEDPA would not affect § 212(c) applications already pending on the enactment date, April 24, 1996. *See Matter of Soriano*, 21 I & N Dec. 516, 1996 WL 426888 (BIA June 27, 1996). Accordingly, in an effort to construct a theory of § 212(c) eligibility, Garcia–Jurado's lawyer attempted (unsuccessfully) to obtain a hearing

before the enactment date of AEDPA. However, by the time of the hearing before the immigration judge, the *Soriano* decision had been vacated by the Attorney General. *See* "Authority of the Attorney General to Grant Discretionary Relief from Deportation under Section 212(c) of the Immigration And Nationality Act as Amended by the Antiterrorism and Effective Death Penalty Act of 1996," 1997 WL 33347804, at n. 4 (O.L.C.) (Att.Gen.Op. Feb. 21, 1997).

apply for a discretionary waiver of deportation, unless they had been "convicted of one or more aggravated felonies and ha[d] served for such felony or felonies a term of imprisonment of at least five years." INA § 212(c); 8 U.S.C. § 1182(c) (repealed) (1994). (Under that statutory scheme, Garcia–Jurado would have been eligible for discretionary relief.) Whether to actually grant such a discretionary waiver—commonly referred to as § 212(c) relief—requires the balancing of "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf[.]" *United States v. Perez*, 330 F.3d 97, 102 (2d Cir.2003) (internal quotation marks omitted).

This scheme was significantly altered when congress enacted AEDPA on April 24, 1996. Section 440(d) of that legislation eliminated § 212(c) hearings for aliens convicted of certain crimes, including that committed by Garcia–Jurado. *See* AEDPA § 440(d)(2). On September 30, 1996, Congress enacted IIRIRA, which repealed § 212(c) altogether and replaced it with a different and narrower form of discretionary relief called cancellation of removal. *See* IIRIRA § 304(b).

For several years after these enactments, the law was unclear as to whether and how AEDPA and IIRIRA applied to pre-enactment convictions and guilty pleas. *See St. Cyr v. I.N.S.*, 229 F.3d 406, 416 n. 6 (2d Cir.2000) (holding that "IIRIRA § 304 does not apply retroactively to pre-enactment guilty pleas"); *id.* at 417 (listing divided circuit courts that dealt with analogous question of AEDPA's application to

pre-enactment guilty pleas). The issue was finally settled by the Supreme Court in 2001, when it held in *I.N.S. v. St. Cyr* that " § 212(c) relief remains available for aliens ... whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." 533 U.S. 289, 326, 121 S.Ct. 2271, 2293, 150 L.Ed.2d 347 (2001), *aff'g*, 229 F.3d 406 (2d Cir.2000).

A second source of confusion was the elimination of judicial review under IIRIRA of deportation proceedings for aliens convicted of aggravated crimes.[3] Although direct judicial appeal had clearly been eliminated by IIRIRA, it was initially unclear whether habeas review of deportation proceedings survived IIRIRA. The Second Circuit later indicated in 1998 that IIRIRA did not strip the courts' habeas jurisdiction. *See Jean–Baptiste v. Reno*, 144 F.3d 212, 219 (2d Cir.1998). However, at the time—and for a while later as well—the answer was very much in doubt. *See Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 480 n. 7, 119 S.Ct. 936, 942 n. 7, 142 L.Ed.2d 940 (1999) (noting that "[t]here is disagreement" as to whether habeas review is still available under IIRIRA and listing circuit court cases). Indeed, the issue was not conclusively settled until the Supreme Court's contemporaneous rulings in *St. Cyr*, 533 U.S. at 314, 121 S.Ct. at 2287, and *Calcano–Martinez v. I.N.S.*, 533 U.S. 348, 351, 121 S.Ct. 2268, 2270, 150 L.Ed.2d 392 (2001) (holding that "the jurisdiction-strip-

---

**3.** The effective date of IIRIRA was April 1, 1997. However, IIRIRA provided for transitional provisions which governed cases, such as Garcia–Jurado's, that commenced before April 1, 1997, and in which a deportation order became administratively final after October 30, 1996. *See United States v. Gonzalez–Roque*, 301 F.3d 39, 49 n. 9 (2d Cir.2002).

The jurisdiction-stripping transitional provision provided that " 'there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in [certain sections of the code.]' " *Id.* (quoting IIRIRA § 309(c)(4)(G)) (alterations by *Gonzalez–Roque* ).

ping provisions of [IIRIRA do not] preclude aliens such ... from pursuing habeas relief pursuant to § 2241"), *aff'g*, 232 F.3d 328 (2d Cir.2000).

The government and Garcia–Jurado agree that under the current interpretation of AEDPA and IIRIRA, Garcia–Jurado would have been eligible for § 212(c) relief. The parties also agree that habeas review would have been available as well. However, at the time of Garcia–Jurado's deportation, neither the Supreme Court nor the Second Circuit had ruled on these issues.

(2)

■ "Since a prior deportation order is an element of [illegal reentry], a defendant charged under section 1326(a) may collaterally attack the validity of a prior deportation order and proceedings." *United States v. Calderon*, 2003 WL 1338943, at *4 (E.D.N.Y. Jan.9, 2003) (Weinstein, J.) (citations omitted); *see United States v. Mendoza–Lopez*, 481 U.S. 828, 837–38, 107 S.Ct. 2148, 2155, 95 L.Ed.2d 772 (1987) (allowing collateral attacks on the underlying deportation in illegal reentry charges). In *Mendoza–Lopez*, the Supreme Court held that it would be a violation of due process to allow the imposition of "a criminal penalty for reentry after *any* deportation, regardless of how violative of the rights of the alien the deportation proceeding may have been." 481 U.S. at 837, 107 S.Ct. at 2155. The Supreme Court affirmed an Eighth Circuit decision, which held that an alien's uninformed waiver of his rights to appeal or seek a suspension of deportation rendered the deportation fundamentally unfair and that such a deportation can be collaterally attacked in an illegal reentry charge. *See id.* at 832, 107 S.Ct. at 2152. *Mendoza–Lopez* reviewed solely the question of whether the deporta-

tion can *ever* be collaterally attacked—assuming, at the request of the government—that the deportation proceedings the aliens complained of were indeed "fundamentally unfair." 481 U.S. at 839–40, 107 S.Ct. at 2156.

The Supreme Court held that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Id.* at 837–38, 107 S.Ct. at 2155. "[A]t a minimum, the result of an administrative proceeding may not be used as a conclusive element of a criminal offense where the judicial review that legitimated such a practice in the first instance has effectively been denied." *Id.* at 838 n. 15, 107 S.Ct. at 2155 n. 15.[4] In addition to showing deprivation of judicial review, the courts required a showing "that the deportation hearing was fundamentally unfair.... In other words, ... that he was prejudiced." *United States v. Espinoza–Farlo*, 34 F.3d 469, 471 (7th Cir.1994) (listing circuit court cases "unanimous in the view" that *Mendoza–Lopez* also required a showing of prejudice); *accord United States v. Fares*, 978 F.2d 52, 57 (2d Cir.1992).

Congress later codified the *Mendoza–Lopez* holding, as well as the prejudice requirement, in 8 U.S.C. § 1326(d). *See* AEDPA § 441(a). Under 8 U.S.C. § 1326(d), to succeed in collaterally attacking the deportation order, the defendant must demonstrate that

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial

---

4. The Supreme Court also noted that "[e]ven with this safeguard, the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling." *Mendoza–Lopez*, 481 U.S. at 838 n. 15, 107 S.Ct. at 2155 n. 15.

review; and (3) the entry of the order was fundamentally unfair. *Id.* The three "requirements are conjunctive, and thus [defendant] must establish all three in order to succeed in his challenge to his removal order." *United States v. Fernandez–Antonia*, 278 F.3d 150, 157 (2d Cir.2002). In this case, only two prongs—deprivation of judicial review and fundamental unfairness—are contested. The government concedes that Garcia–Jurado satisfied the exhaustion requirement.

### (3)

### Deprivation of Judicial Review

■ The deprivation of the opportunity for judicial review is central to the due process concerns expressed in *Mendoza–Lopez. See* 481 U.S. at 837–39, 107 S.Ct. at 2155; *Calderon,* 2003 WL 1338943, at *5. "Section 1326 does not, on its face, require that the earlier deportation have been 'lawful' to support a conviction for illegal reentry." *United States v. Paredes–Batista,* 140 F.3d 367, 376 (2d Cir. 1998) (citations omitted). Nonetheless, "due process dictates that a disposition in a deportation hearing may not be used 'to establish conclusively an element of a criminal offense' unless it is, at some point, subject to judicial review." *Id.* (quoting *MendozaLopez,* 481 U.S. at 838, 107 S.Ct. at 2155).

The Supreme Court has declined "to enumerate which procedural errors are so fundamental that they may functionally deprive the alien of judicial review," *Mendoza–Lopez,* 481 U.S. at 839 n. 17, 107 S.Ct. at 2155 n. 17. However, subsequent caselaw offers some guidance. For example, the deportation of an alien while his administrative appeal is still pending has been held to be a deprivation of judicial review. *See Perez,* 330 F.3d at 103; *United States v. Frias–Gomez,* 262 F.Supp.2d 11, 14 (E.D.N.Y.2003) (Weinstein, J.). The courts have also found deprivation where, because of an administrative judge's error or inadequate counsel, an alien was inadequately informed of his right to appeal or seek judicial review. *See United States v. Perez,* 213 F.Supp.2d 229, 232–33 (E.D.N.Y.2002.) (Weinstein, J.) (listing cases), *aff'd,* 330 F.3d 97.

### (4)

■ At the outset, Garcia–Jurado argues that "the opportunity for judicial review" cited in § 1326(d) is not satisfied by mere habeas review, and that IIRIRA's removal of direct judicial review inherently deprived him of the "the opportunity for judicial review." 8 U.S.C. § 1326(d). Garcia–Jurado points out that the term "judicial review" is used both in the jurisdiction-stripping provisions in IIRIRA (though not in the transitional provision) as well as in § 1326(d). In *St. Cyr,* the Supreme Court interpreted the elimination of "judicial review" under IIRIRA as referring only to direct review and not habeas review. *St. Cyr,* 533 U.S. at 311, 121 S.Ct. at 2285. Consequently, even assuming the availability of habeas review, Garcia–Jurado argues that he was nonetheless deprived of "judicial review" under § 1326(d), being that "judicial review" is understood by the Supreme Court to mean only direct judicial review. *See United States v. Johnson,* 2000 WL 620324, at *7 n. 9 (D.Conn.2000) (questioning, but not deciding, "whether Congress' elimination of federal court jurisdiction to review discretionary decisions of the BIA, satisfies the due process concerns that animated the *Mendoza–Lopez* Court").

However, despite the identical language, it is doubtful that the narrow statutory interpretation of IIRIRA's reference to "judicial review," which was driven in no small part by constitutional concerns, is identical to the term "judicial review" in § 1326(d). *Calcano–Martinez,* 533 U.S. at 351, 121 S.Ct. at 2270 (holding that "seri-

ous constitutional questions ... can best be alleviated by construing the jurisdiction-stripping provisions of that statute not to preclude aliens such as petitioners from pursuing habeas relief pursuant to § 2241.") Moreover, in this case, there was no practical difference between what was reviewable under direct review and via habeas review. The issue that Garcia–Jurado claims he would have raised on direct review—his eligibility for § 212(c) relief—would also have been reviewable through habeas jurisdiction. *See United States v. Gonzalez–Roque,* 301 F.3d 39, 49–50 (2d Cir.2002). As such, the lack of direct review did not implicate the due process concerns that underlie the deprivation of judicial review—specifically, the necessity for "meaningful review" articulated in *Mendoza–Lopez*—because that same meaningful review would have been available on habeas review. Accordingly, the lack of direct judicial review did not deprive Garcia–Jurado of an opportunity for judicial review.

(5)

■ Garcia–Jurado also argues that he faced two impediments in his efforts to obtain even habeas review: a) that habeas review of deportation proceedings was widely believed at the time to be unavailable under IIRIRA; and b) that he was deported before he could seek judicial relief because his motion for reconsideration was still pending before the BIA.

The government argues that Garcia–Jurado was not deprived of judicial review, rather his inaction was based merely on an incorrect assumption that IIRIRA eliminated habeas review, and that nothing prevented him from actually seeking that remedy as others, facing the same circumstances, indeed did. The Second Circuit

agrees. In *Gonzalez–Roque,* 301 F.3d at 50, the Second Circuit held that the defendant failed to show that he was deprived of judicial review of his 1996 final order of deportation despite IIRIRA's elimination of direct judicial review of deportation proceedings. *See id.* (reversing district court's dismissal of illegal reentry charge based on defendant's collateral attack of deportation proceedings where immigration judge did not allow, after several adjournments, additional time for alien to seek adjustment of his status).

The defendant in *Gonzalez–Roque* argued—and the district court had agreed-that because, at the time, "it was not clear even to skilled lawyers that [the defendant] had a right to file a writ of habeas corpus," the defendant had effectively been deprived of judicial review. *United States v. Gonzalez–Roque,* 165 F.Supp.2d 577, 584 (S.D.N.Y.2001), *rev'd,* 301 F.3d 39. The Second Circuit, however, rejected that argument on the ground that the remedy was, nonetheless, available and that, during the same period, "habeas petitions were successfully litigated in this circuit by deportable criminal aliens who, like [the defendant], could not resort to direct judicial review." *Gonzalez–Roque,* 301 F.3d at 50 (citing cases). The Second Circuit also pointed out that IIRIRA made no mention of habeas review and that the plain language of the Suspension Clause makes it clear that IIRIRA could not strip the court of habeas review. *Id.; see United States v. Cottone,* 244 F.Supp.2d 126, 128 (E.D.N.Y.2003) (Spatt, J.); *United States v. Lopez,* 2002 WL 32096595, at *3 (E.D.N.Y. Dec.13, 2002) (Johnson, J.). Accordingly, Garcia–Jurado's mistaken understanding that habeas review was unavailable did not, in itself,[5] deprive him of

---

5. The application of AEDPA and IIRIRA to pre-enactment convictions was not at issue in the *Gonzalez–Roque* case. The defendant was apparently eligible for some form of relief;

the question was whether the immigration judge gave him enough time to apply for it. *See Gonzalez–Roque,* 301 F.3d at 44–45. Consequently, had the alien in the *Gonzalez–Ro-*

judicial review because such review was actually available had he pursued it.[6]

■ Nonetheless, the holding in *Gonzalez–Roque* is not fatal to Garcia–Jurado's claim of deprivation because of the additional barriers that prevented Garcia–Jurado from seeking judicial review. After the BIA denied his application for an emergency stay of deportation, Garcia–Jurado was deported while his motion for reconsideration was still pending before the BIA. When he was deported, he had not yet reached the point where his administrative proceedings were complete, and,

by all accounts, he was deported before his deadline for judicial review had passed. *See Perez,* 330 F.3d at 103 (holding that the deportation of alien before the BIA ruled on his appeal of a denial of a motion to reopen deprived him of opportunity to seek judicial review); *Frias–Gomez,* 262 F.Supp.2d at 14 (finding that deportation of alien before deadline for administrative appeal deprived him of meaningful review). By the time Garcia–Jurado's motion for reconsideration had been constructively withdrawn, he was out of the country, and, of course, no judicial review followed. Accordingly, Garcia–Jurado has established

*que* chosen to challenge his deportation order in court, he would have faced only one legal barrier (other than the ultimate merits of his request): the courts' seeming lack of jurisdiction over his petition. Garcia–Jurado, however, faced three legal barriers (habeas jurisdiction, the "in custody" requirement, and the application of AEDPA and IIRIRA to pre-enactment convictions) all of which were contested by the INS at the time.

It is unnecessary to decide whether the *Gonzalez–Roque* holding applies to an alien who faced these additional legal uncertainties because, as determined below, Garcia–Jurado was clearly deprived of judicial review by virtue of his deportation before his motion for reconsideration was decided. As such, it is preferable to leave unanswered the question whether an alien, particularly one who faced continued detention, was effectively deprived of a practical opportunity for judicial review in the face of the INS asserting *multiple* incorrect interpretations of the law. However, other courts have applied the *Gonzalez–Roque* even where the alien faced multiple legal challenges. *See United States v. Roque Espinoza,* 338 F.3d 724, 727 (7th Cir.2003) (citing *Gonzalez–Roque* in holding that despite the seeming futility of pursuing eligibility for § 212(c) relief via habeas petition "[n]othing prevented Roque Espinoza from playing the role of [Enrico] St. Cyr in his particular situation"); *Lopez,* 2002 WL 32096595, at *3 (citing *Gonzalez–Roque* in holding that alien's assumption that courts would uphold INS's application of AEDPA and IIRIRA to pre-enactment convictions did not result in deprivation of judicial review).

**6.** In a similar vein, Garcia–Jurado also argues that his quest for judicial review faced an additional uncertainty because he was released on bail until immediately before his deportation and, therefore, did not meet the habeas jurisdictional requirement that he be in custody. Although courts at the time were already breaking away from the traditional requirement that a habeas petitioner be in actual physical custody, the Second Circuit had not yet ruled on whether a non-incarcerated alien subject to final order was "in custody" for purposes of habeas jurisdiction. *Compare Isaraphanich v. Sava,* 663 F.Supp. 120, 122 (S.D.N.Y.1987) (holding that even under Supreme Court's liberal interpretation of "in custody," petitioner released on $25,000 bail did not satisfy custody requirement), *with Mojica v. Reno,* 970 F.Supp. 130, 164 (E.D.N.Y.1997) (Weinstein, J.) ("Where the petitioner is subject to a final order of deportation, the 'custody' requirement is satisfied, particularly where the alien has been released on condition of posting a bond.") (citations omitted); *see also Henderson v. I.N.S.,* 157 F.3d 106, 124 (2d Cir.1998) (noting "that the concept of 'in custody' for habeas purposes has broadened in recent years" and holding that an alien who has been released on bail from INS detention but is subject to a final order of removal satisfied custody requirement). However, this argument suffered the same infirmities as that of the defendant in *Gonzalez–Roque.* Given that at the time he was deported, courts had already begun entertaining habeas petitions from aliens not in physical custody, his assumption that he lacked habeas jurisdiction did not, in and of itself, deprive him of judicial review.

that he was deprived of judicial review of his deportation.

## (6)

### Fundamental Unfairness

■ The final statutory [7] requirement of fundamental unfairness is the source of confusion [8] and conflict among the courts, in particular as it relates to aliens who were incorrectly deemed ineligible for discretionary relief. This much is certain: to show that a prior deportation was fundamentally unfair, a defendant must show actual prejudice. *See Fernandez–Antonia,* 278 F.3d at 159. "Actual prejudice exists where defects in the deportation proceedings 'may well have resulted in a deportation that would not otherwise have occurred.'" *Id.* (quoting *United States v. Torres–Sanchez,* 68 F.3d 227, 230 (8th Cir. 1995) (internal quotations marks omitted)).

However, the courts differ whether the fundamental unfairness prong requires a showing of a *procedural* defect in the administrative hearing itself. Several circuits have held that to succeed in a collateral attack, the defendant must show more than just deprivation of judicial review and prejudice; the defendant must also show a fundamental procedural defect in the administrative hearing itself. *See United States v. Wilson,* 316 F.3d 506, 510 n. 1 (4th Cir.2003) ("[T]he question whether [the defendant] was denied judicial review in his original deportation proceedings is independent from the question whether the proceedings were fundamentally unfair, *i.e.,* whether they impinged upon a cognizable due process right."); *United States v. Lopez–Ortiz,* 313 F.3d 225, 229– 30 (5th Cir.2002) (holding that "[f]undamental fairness is a question of procedure" and that the defendant must show that "*in addition to being fundamentally unfair,* the hearing effectively eliminated the right to [judicial review]."); *see also United States v. Mendez–Morales,* 2003 WL 21479173, at *8 n. 3 (D.Neb. June 25, 2003) (noting that "[t]he Eighth Circuit appears to follow the majority view that under *Mendoza–Lopez,* only 'procedural errors,' as opposed to errors in the substantive application of law," can satisfy the fundamental unfairness requirement.).

This understanding of *Mendoza–Lopez* dictates that even where the immigration judge reached a wrong result and judicial review was not available, a collateral at-

---

**7.** The language in § 1326 setting forth the requirements for a collateral attack generally reflects that of *Mendoza–Lopez,* though not verbatim. However, the courts have made it clear "that Congress did not intend to alter the substantive showing required to collaterally attack an underlying removal order … if only to avoid the constitutional issues that would be raised if Congress attempted to alter the requirements of *Mendoza–Lopez* and its progeny." *United States v. Brown,* 148 F.Supp.2d 191, 196 n. 4 (E.D.N.Y.2001) (Sifton, J.).

**8.** The confusion over the meaning of fundamental unfairness can be traced to the "unusual procedural posture" of *Mendoza–Lopez,* and its usage of the term fundamental unfairness. *Fares,* 978 F.2d at 57; *see United States v. Sanchez–Peralta,* 1998 WL 63405, at *7 n. 8 (S.D.N.Y. Feb.13, 1998) ("*Mendoza–Lopez's*

'curious' procedural circumstance makes the 'intended scope of the opinion … difficult to divine.' ") (quoting *United States v. Zaleta–Sosa,* 854 F.2d 48, 50 (5th Cir.1988) (alterations by *Sanchez–Peralta* )). In *Mendoza–Lopez,* the respondents had argued that their deportations were fundamentally unfair because their waivers of possible discretionary relief and appellate rights were not knowing and intelligent. On appeal, the government asked the Supreme Court to assume the fundamental unfairness of the deportation and rule solely on the question whether a defendant could *ever* collaterally attack a deportation order in an illegal reentry charge. *See id.* at 839–40, 107 S.Ct. at 2156. The Supreme Court complied with the government's request and assumed that the underlying deportations were fundamentally unfair. *See id.* Consequently, the Supreme Court did not define the contours of fundamental unfairness.

tack will fail unless the defendant can point to a due process violation in the deportation proceeding itself. *See Mendez–Morales,* 2003 WL 21479173, at *8 (rejecting defendants argument that the immigration judge applied the wrong legal standard as "simply another attempt 'to turn the fundamental fairness inquiry, which is procedural in nature, into an expanded, substantive inquiry.' ") (quoting *United States v. Hernandez–Rodriguez,* 170 F.Supp.2d 700, 703–04 (N.D.Tex. 2001)); *Cottone,* 244 F.Supp.2d at 130 (rejecting defendants collateral challenge based on the denial of a § 212(c) hearing because "fundamental fairness is solely an issue of procedural due process" and the denial of the hearing was "a substantive one") (citation omitted); *United States v. Torres,* 268 F.Supp.2d 455, 458 (E.D.Pa. 2003) (same). Consequently, where the singular procedural defect is the elimination of direct judicial review, and no procedural defect existed in the deportation proceeding, these courts hold that a mere substantive legal error in the administrative procedure would not raise a successful collateral attack against that deportation.

Moreover, by viewing fundamental unfairness through the prism of due process, even a procedural defect in the deportation hearing—such as the waiver of appellate rights based on an immigration judge's misinformation regarding eligibility for discretionary relief—will not suffice for a collateral attack, unless the defendant can show that the procedural defect violated his due process protections. *See Wilson,* 316 F.3d at 510 ("even if [the defendant] was entitled to have the BIA consider his section 212(c) application, he cannot show that the failure of the BIA to do so denied him due process because he had no due process right in the section 212(c) relief"); *United States v. Lopez,* 2002 WL 32096595, at *3 n. 3 (" 'As a piece of legislative grace, it conveyed no rights, it conferred no status, and its denial does not implicate the Due Process clause' ") (quoting *Lopez–Ortiz,* 313 F.3d at 231); *see also United States v. Roque–Espinoza,* 338 F.3d 724, 727 (7th Cir. 2003) (dicta) (noting "that it would be hard to show that the loss of a chance at wholly discretionary relief from removal is the kind of deprivation of liberty or property that the due process clause is designed to protect").

Other courts, however, have held that a deportation is fundamentally unfair where, in addition to a deprivation of judicial review, the immigration judge makes *either* a procedural or substantive error of law (which affected the result), regardless of whether the defect is a violation of due process. *See United States v. Holland,* 876 F.2d 1533, 1536 (11th Cir.1989) ("Although the Fifth Circuit ... treated these two factors [deprivation of judicial review and fundamental unfairness] as distinct requirements, we believe they are intertwined. It may be that the errors at the hearing combined with the lack of judicial review render a proceeding fundamentally unfair.") (citation omitted); *United States v. Frias–Gomez,* 262 F.Supp.2d at 16; *cf. United States v. Vieira–Candelario,* 6 F.3d 12, 15 (1st Cir.1993) (affirming denial of motion to dismiss illegal reentry charge despite immigration judge's "error of law" in denying eligibility for § 212(c) relief for represented alien because there was no deprivation of judicial review where alien voluntarily withdrew notice of appeal).

These courts hold that after showing a deprivation of judicial review, the focus of the fundamental unfairness inquiry shifts to prejudice, namely, that the result would have been different had judicial review been available. *See Holland,* 876 F.2d at 1536; *United States v. Diaz–Nin,* 221 F.Supp.2d 584, 590 (D.Vi.2002); *United States v. Ojeda–Escobar,* 218 F.Supp.2d 839, 844 & n. 8 (W.D.Tex.2002) ("Although in many instances, fundamental unfairness

results from procedural deficiencies, ... it may also result when the removal order is based on an erroneous application of the law[.]") (citing *United States v. Girosky–Garibay,* 176 F.Supp.2d 705, 711 (W.D.Tex.2001)) (other citation omitted).[9] This conception views the meaningful review requirement cited by *Mendoza–Lopez* as the primary due process concern—that where the prior deportation was wrong and the alien did not have an opportunity for judicial review, using that result to establish a criminal element would be a violation of due process. *See Diaz–Nin,* 221 F.Supp.2d at 590; *Ojeda–Escobar,* 218 F.Supp.2d at 844. Accordingly, in reviewing collateral attacks based on the failure to allow for discretionary relief, the focus

is on the result of the deportation proceeding: would the result have been different had the alien not been deprived of judicial review (without regard to whether the basis for that improper result was a procedural defect or simply a misinterpretation the law).[10]

### (7)

Not surprisingly, the government urges that this court follow the lead of the Fourth and Fifth Circuits and hold that Garcia–Jurado fails to show fundamental unfairness because the IJ's error was merely a misapplication of the law (not a due process violation) and because the loss of discretionary relief was not fundamentally unfair given that it is merely a legislative grace.[11] Garcia–Jurado, on the other hand, asks that the reasoning of

9. The decision in *Ojeda–Escobar,* 218 F.Supp.2d at 844, by the Western District of Texas predated the Fifth Circuit's decision in *Lopez–Ortiz,* 313 F.3d at 229–30, which rejected a collateral attack based on the improper denial of discretionary relief.

10. The Ninth and Tenth Circuits have also held that an immigration judge's misinforming or failing to inform an unrepresented alien regarding eligibility for discretionary relief is a defect that can be collaterally attacked when paired with the deprivation of judicial review and prejudice. *See United States v. Leon Paz,* 340 F.3d 1003, 1007 (9th Cir.2003) (vacating conviction for illegal reentry where unrepresented alien was misinformed as to eligibility for discretionary relief); *United States v. Arrieta,* 224 F.3d 1076, 1079 (9th Cir.2000) (reversing conviction for illegal reentry where unrepresented alien was not informed of eligibility of § 212(h) relief); *United States v. Aguirre–Tello,* 324 F.3d 1181, 1192 (10th Cir.2003) (affirming dismissal of illegal reentry charge where immigration judge failed to inform alien that he would be eligible for § 212(c) relief if he were to postpone the hearing by one day). However, in its formulation of the fundamental unfairness prong, the Ninth Circuit seems to focus on whether the underlying defect was a due process violation. Nonetheless, as explained more fully below, it does so because the defendant argued that the defect, as a due process violation, also denied him the opportunity for judicial review. *Arrieta,* 224 F.3d at

1079. In any case, the Tenth Circuit, in *Aguirre–Tello,* is clear that a procedural defect that does not rise to a due process violation— e.g., an immigration judge's failure to adhere to a procedural "duty"—could still be the basis for a finding of fundamental unfairness and the denial of judicial review. *See Aguirre–Tello,* 324 F.3d at 1190 n. 8, n. 9; *cf. id.* at 1200 n. 2 (dissent).

11. The government also argues that the IJ did not make an error of law because at the time of the IJ's decision, neither the Second Circuit nor the Supreme Court had ruled that AEDPA did not apply to pre-enactment guilty pleas. The government points out that under the established principles of finality, the rule announced in *St. Cyr* does not apply retroactively to aliens already deported pursuant to a final judgment. *See Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993). The government's argument bears a striking resemblance to that made earlier (unsuccessfully) by Garcia–Jurado that seeking habeas review was futile under the then-accepted interpretation of the law. *See Gonzalez–Roque,* 301 F.3d at 50. Garcia–Jurado is not here seeking to reopen his deportation proceeding-assuming that it was ever properly closed; the inquiry here is limited to the criminal charge of illegal reentry which does not impact the underlying deportation at all. Although the government may be correct in that the IJ's ruling was consistent with some legal precedent at

Eleventh Circuit and the other courts be adopted in finding that the deportation of Garcia–Jurado could not support the charge of illegal reentry. *See also Arrieta*, 224 F.3d at 1079; *Aguirre–Tello*, 324 F.3d at 1192.

In this circuit, the district courts have been divided over whether fundamental fairness is solely a matter of due process, as well as whether the improper denial of a hearing for discretionary relief can be the basis for a collateral attack.[12] Recently, the Second Circuit settled the latter question, holding that where the alien, because of negligent counsel, lost the opportunity to seek a hearing for § 212(c) relief, the loss can be the basis for a successful collateral attack. *Perez*, 330 F.3d at 102. In *Perez*, the Second Circuit affirmed the district court's dismissal of an illegal entry charge, holding that although there is no

the time, the IJ's ruling was incorrect. The Supreme Court's ruling in *St. Cyr* "did not change the law," it merely " 'finally decided what [IIRIRA] had *always* meant and explained why the [BIA and the] Courts of Appeals had misinterpreted the will of the enacting Congress.' " *Lopez–Ortiz*, 313 F.3d at 230 (quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994)) (alterations by *Lopez–Ortiz*; emphasis by *Rivers*); *see id.* (rejecting government's argument that the immigration judge's denial of § 212(c) hearing was correct at the time despite fact that before the Supreme Court's ruling in *St. Cyr*, the Fifth Circuit had ruled that repeal of § 212(c) relief applied to pre-enactment guilty pleas); *but see Alvarenga Villalobos v. Ashcroft*, 271 F.3d 1169, 1173 (9th Cir.2001); *see also Drax v. Reno*, 338 F.3d 98, 2003 WL 21783250, at n. 27 (2d Cir. Aug.4, 2003) (noting the "interesting jurisprudential question as to whether [an] immigration judge's mistake—based on his good-faith understanding of the law as delineated by the relevant authorities available at the time [of] the petitioner's immigration hearing—can properly be considered error").

**12.** *See Calderon*, 2003 WL 1338943, at *6 (Weinstein, J.) (holding that immigration judge's "misinforming an alien as to the availability of discretionary relief is a procedural error so fundamental that it functionally deprives an alien of judicial review"); *Frias–Gomez*, 262 F.Supp.2d at 16 (Weinstein, J.) (pre-*St. Cyr* denial of § 212(c) hearing was fundamental procedural error even though alien was represented by counsel); *Cottone*, 244 F.Supp.2d at 130 (Spatt, J.) (rejecting defendants collateral challenge based on the denial of a § 212(c) hearing because "fundamental fairness is solely an issue of procedural due process" and the denial of the hearing was "substantive one"); *Lopez*, 2002 WL 32096595, at *3 n. 3 (E.D.N.Y. Dec.13, 2002) (Johnson, J.) (" 'As a piece of legislative grace, [the existence of 212(c) relief] conveyed no rights, it conferred no status, and its denial does not implicate the Due Process clause' "); *Copeland*, 228 F.Supp.2d at 271–72 (Weinstein, J.) (deportation order was fundamentally unfair where immigration judge affirmatively misled alien as to eligibility for discretionary relief); *Perez*, 213 F.Supp.2d 229, 232–33 (Weinstein, J.) (dismissing illegal reentry charge where alien's counsel failed to apply for available discretionary relief), *aff'd*, 330 F.3d 97; *United States v. Brown*, 127 F.Supp.2d 392, 405–06 (W.D.N.Y.2001) (finding no fundamental unfairness in deportation proceeding despite possible failure of immigration judge to follow regulations because the alien "was afforded all requisite Fifth Amendment due process protection"); *Sanchez–Peralta*, 1998 WL 63405, at *11 (explaining that focus of *Mendoza–Lopez* was on judicial review and that fundamental unfairness only required that "in addition to having been deprived of judicial review, he was prejudiced by a flaw that occurred at his deportation proceeding," and finding that alien failed to show prejudice in loss of § 212(c) hearing and that waiver of appellate rights was an informed choice); *see also United States v. Figueroa–Taveras*, 228 F.Supp.2d 428, 432 (S.D.N.Y.2002) (dismissing illegal reentry charge where alien was provided erroneous advice by the immigration judge holding that deportation order is fundamentally unfair if he was prejudiced by the "deprivation of judicial review and inability to exhaust administrative remedies") (citing *Sanchez–Peralta*, 1998 WL 63405, at *11), *rev'd*, 69 Fed.Appx. 502, 504 (2d Cir.2003) (unpublished) (reversing district court on prejudice grounds because it was "extremely unlikely" that defendant would have received § 212(c) relief).

Sixth Amendment right to counsel in deportation proceedings, the defendant's counsel was " 'so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.' " *Id.* at 101 (quoting *Saleh v. United States Dep't of Justice*, 962 F.2d 234, 241 (2d Cir.1992)). Accordingly, the Second Circuit found that the counsel's failure to apply for discretionary relief violated due process, effectively depriving the defendant of judicial review.[13] *See id.* at 100.

However, the Second Circuit has not made a definite statement as to whether the fundamental unfairness prong can be satisfied by showing a substantive error in the deportation proceedings coupled with a deprivation of judicial review. Because the Second Circuit cases involving collateral attacks have dealt with allegations of procedural defects, it is difficult to glean from them whether the focus on the procedural deficiencies was by design or default. *See, e.g., Perez*, 330 F.3d at 102; *Fernandez–Antonia*, 278 F.3d at 157; *Paredes–Batista*, 140 F.3d at 376–77; *Fares*, 978 F.2d at 56–57. This is not surprising given that, unlike Garcia–Jurado (who was deported before he could pursue judicial review), typically, the purported deprivation of judicial review arises from procedural errors in the proceedings that con-

structively denied judicial review. For example, a common thread in many of these cases is the claim that judicial review was deprived by an immigration judge's misinformation or lack of notification of appellate rights. *See, e.g., Fares*, 978 F.2d at 57.[14]

Nonetheless, a close reading of Second Circuit caselaw suggests that, after showing deprivation of judicial review, the crux of the fundamental unfairness prong is less about the nature of the defect in the proceeding, and more about whether the defect affected the outcome. The Second Circuit, in applying *Mendoza–Lopez*, "established a two-step inquiry that in substance resembles the three-step framework codified by Congress in § 1326." *United States v. Fernandez–Antonia*, 2000 WL 1716436, at *4 n. 6 (S.D.N.Y. Nov.15, 2000), *aff'd*, 278 F.3d 150.

> For an alien to succeed in collaterally attacking his deportation order, he "must show not only that he was effectively deprived of his right of direct appeal, but also that the administrative proceedings were fundamentally unfair in *some* respect that would have entitled him to relief on direct appeal."

*Fernandez–Antonia*, 278 F.3d at 157 (quoting *Fares*, 978 F.2d at 57; citing *Paredes–Batista*, 140 F.3d at 378 (emphasis added)).[15] In any case, the Second Circuit

---

**13.** Although the Second Circuit in *Perez* focused on the due process violation in finding that the proceedings were fundamentally unfair, as explained more fully below, it did so mainly in the context of determining whether the alien was deprived of judicial review—that is, although Perez was not physically prevented from seeking judicial review, the due process error was so fundamental that it *"functionally* deprive[d him] of judicial review." *Mendoza–Lopez*, 481 U.S. at 839 n. 17, 107 S.Ct. at 2155 n. 17 (emphasis added).

**14.** In cases where the deprivation of judicial review is the result of procedural defects in the administrative hearings, the question whether fundamental unfairness requires an

additional showing of procedural defect is academic because a procedural error had already been shown. *See, e.g., Perez*, 330 F.3d at 104 ("In considering earlier in this opinion whether Perez was deprived of the opportunity for judicial review, we found that he had shown that he had been deprived of effective assistance of counsel (i.e., that a fundamental procedural error had occurred.)"). It is in an unusual case such as this—where the deprivation occurred outside of the administrative proceedings—that the question can become significant.

**15.** Interestingly, there seemed to have been a (short-lived) understanding, by some, that the

certainly has never required that a procedural defect rise to a due process violation in order to collaterally attack the deportation (when coupled with a deprivation of judicial review).

(8)

■ Here, the IJ erred in failing to provide Garcia–Jurado a § 212(c) hearing. The denial of the hearing was a procedural error that rendered the proceedings fundamentally unfair. *See Frias–Gomez*, 262 F.Supp.2d at 16 (holding that improper denial of represented alien's opportunity to apply for § 212(c) relief and his deportation before he could contest that decision were "fundamental procedural errors"). The Second Circuit has made it clear that the loss of § 212(c) relief is the kind of error that will support a collateral attack, *see Perez*, 330 F.3d at 102, and, as such, it is unnecessary to inquire whether the procedural error itself rose to a level of a due process violation.

■ Moreover, even if the denial of § 212(c) hearing is considered a substantive error of law, it can be the basis for a showing of fundamental unfairness. Although the Second Circuit has not spoken directly on the issue, the persuasive view is that it is unnecessary for the underlying defect to be a procedural error, let alone a due process violation, for a collateral review to be available when the defendant has shown a deprivation of judicial review. *See Holland*, 876 F.2d at 1536 (citing *United States v. Palacios–Martinez*, 845 F.2d 89, 94 (5th Cir.1988) (Thornberry, J., con-

curring)). Indeed, *Mendoza–Lopez* is quite clear that the thrust of fundamental unfairness is the denial of judicial review combined with prejudice. *See Sanchez–Peralta*, 1998 WL 63405, at *9 n. 10 ("The [Second Circuit] has suggested that the thrust of *Mendoza–Lopez* concerns merely whether the alien was put on notice of his right to appeal—not on notice of the right to alternative relief.") (citing *Fares*, 978 F.2d at 56).

In *Mendoza–Lopez*, the Supreme Court noted that "use of the result of an administrative proceeding to establish an element of a criminal offense is troubling" and held that "at a minimum, the result of an administrative proceeding may not be used as a conclusive element of a criminal offense where the judicial review that legitimated such a practice in the first instance has effectively been denied." 481 U.S. at 838 n. 15, 107 S.Ct. at 2155 n. 15. Although the respondents in *Mendoza–Lopez* were never actually prevented from seeking judicial review (they had waived those rights, unknowingly, they claimed), the Supreme Court held that procedural errors can be so fundamental "that they may functionally deprive the alien of judicial review." *Id.* at 839 n. 17, 107 S.Ct. at 2155 n. 17. Accordingly, "[i]f the violation of respondents' rights ... amounted to a complete deprivation of judicial review of the determination, that determination may not be used to enhance the penalty for an unlawful entry under § 1326" *Id.* at 840, 107 S.Ct. at 2156. The Supreme Court, at the government's request, assumed that

Second Circuit provided two methods of showing fundamental unfairness: by showing *either* a violation of due process (even without a showing of prejudice), *or* by showing that " 'a fully informed exercise of his right of direct appeal would have yielded [him] ... relief from deportation.' " *Brown*, 148 F.Supp.2d at 200 (quoting *Paredes–Batista*, 140 F.3d at 378) (alterations by *Brown*). However, the Second Circuit held in *Fernan-*

*dez–Antonia* that the defendant must always show prejudice to succeed on collateral attack, even where the deportation proceeding violated the defendant's due process. 278 F.3d at 159 ("Contrary to [the defendant's] reading, *Paredes–Batista* did not establish a means of demonstrating prejudice simply by showing procedural errors in the deportation hearing.").

the errors in the proceedings deprived the respondents of judicial review, and concluded that "[b]ecause respondents were deprived of their rights to appeal, . . . the deportation proceeding in which these events occurred may not be used to support a criminal conviction[.]" *Id.* at 842, 107 S.Ct. at 2157.

■ As such, "[d]eprivation of the opportunity for judicial review lies at the heart" of the due process concerns expressed by *Mendoza–Lopez. Calderon,* 2003 WL 1338943, at *5. Of course, procedural errors can be so egregious that they also deprive the alien of judicial review. Hence, when the defendant was not actually prevented from seeking judicial review, the only way to satisfy the deprivation prong is to show a fundamental procedural error in the proceedings that effectively deprived the alien of judicial review. However, once a showing of deprivation has been made, a collateral review becomes necessary. All that the fundamental unfairness prong then requires is a showing that errors were made, that is, that the result would have been different.

This formulation of fundamental unfairness makes sense. Regardless of any errors that occur at a deportation proceeding, the availability of judicial review operates to mitigate those errors because judicial review was available to correct them—unless, of course, those errors are so fundamental as to effectively deny judicial review. *See Sanchez–Peralta,* 1998 WL 63405, at *12 ("[E]ven a showing of prejudice would not suffice if an alien had obtained a fair opportunity to file a direct appeal from his deportation order. In such a case, the appeal is the means to correct the error[.]") (internal quotation marks omitted). However, the converse (*i.e.,* that the deprivation of judicial review is mitigated by the fact that the error was not a constitutional violation), does not hold true.[16] That is because once deprivation has been shown, collateral review is mandatory: "Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense." *Mendoza–Lopez,* 481 U.S. at 839, 107 S.Ct. at 2155. To allow collateral review only after a fundamental procedural error when a defendant has already shown deprivation of judicial review, turns the *Mendoza–Lopez* fundamental fairness inquiry on its head.

Now, one can argue that all *Mendoza–Lopez* requires in the absence of contemporaneous judicial review, is that "*some* . . . alternative means of obtaining judicial review must be made available." *Id.* at 838, 107 S.Ct. at 2155. *Mendoza–Lopez* does not dictate the scope of the "alternative" review. *Id.* Arguably, the "alternative" review could be satisfied by a review (albeit a narrow one) limited only to whether the proceedings violated due process. However, the Second Circuit has rejected that reasoning, citing *Mendoza–Lopez* as "suggest[ing] that there is more concern about the validity of a deportation order when it is used as the basis for a criminal conviction than when it is used as the basis for deportation, a civil matter." *Perez,* 330 F.3d at 103. "Accordingly, it would not be logical to subject a deportation order to less scrutiny in the criminal context than in the civil context of deportation[.]" *Id.*

---

16. However, as universally accepted, a lack of prejudice does mitigate the deprivation because the deprivation is then shown to not have affected the outcome. *Fernandez–Antonia,* 278 F.3d 150, 159.

Clearly, the Supreme Court's requirement of meaningful review of the administrative proceeding is not satisfied by a review limited to fundamental constitutional transgressions. To hold so would allow for meaningful review that is narrower than the already minimal habeas review that should have been made available to Garcia–Jurado—which does include review of legal error such as the failure to hold a § 212(c) hearing. *See St. Cyr,* 533 U.S. at 314, 121 S.Ct. at 2287. Consequently, because Garcia–Jurado was deprived of judicial review and the IJ erred, his deportation was fundamentally unfair—regardless of whether the IJ's error is characterized as substantive or procedural—*if* Garcia–Jurado can also show that he was prejudiced by the denial of a hearing for § 212(c) relief.

**(9)**

■ Finally, to succeed in establishing fundamental unfairness, Garcia–Jurado must also show actual prejudice. *See Fernandez–Antonia,* 278 F.3d at 159. Essentially, he must show that the deprivation of judicial review "may well have resulted in a deportation that would not otherwise have occurred." *Id.* (internal quotations marks omitted). Garcia–Jurado must show that had the IJ entertained his request for a § 212(c) hearing, he may well have received relief from deportation.

The Second Circuit has previously " 'decline[d] to state the quantum of proof necessary for an alien to succeed in his demonstration of prejudice' on collateral review but suggested that a showing that there was a 'reasonable likelihood' that an alien would not have been deported or a 'plausible' showing of such might be sufficient." *Perez,* 330 F.3d at 104 n. 6 (quoting *Fernandez–Antonia,* 278 F.3d at 159–60) (alteration by *Perez* ); *see Calderon,* 2003 WL 1338943, at *7 (finding prejudice where defendant made "plausible showing that had he been granted a section 212(c)

hearing, he would not have been deported"); *Sanchez–Peralta,* 1998 WL 63405, at *12–13 (applying "reasonable likelihood" standard in finding that defendant failed to show prejudice, and explaining that the reasonable likelihood standard "does not require a party to show that a certain result was more likely than not to have occurred, but does require showing more than a mere possibility.") (internal quotation marks omitted); *see also Aguirre–Tello,* 324 F.3d at 1193 ("A 'might have' rather than a 'would have' standard comports with the standards in all of the other circuits that have decided this question. The Ninth Circuit requires only plausible grounds of relief which might have been available[.] The First, Third, Fourth, Fifth, and Eighth Circuits have required a 'reasonable likelihood' that but for the errors alleged, the outcome would have been different.") (internal quotation marks and citations omitted).

■ As mentioned above, an immigration judge's determination whether to grant discretionary relief under § 212(c) requires the balancing of "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf[.]" *Perez,* 330 F.3d at 102 (internal quotation marks omitted).

Adverse factors include: 1) the nature and circumstances of the exclusion ground; 2) the presence of additional immigration law violations; 3) the existence of a criminal record and its nature, recency and seriousness; and 4) the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. Favorable factors, by comparison, include: 1) family ties within this country; 2) residence of long duration in this country; 3) evidence of hardship to the alien and the

alien's family upon deportation; 4) Armed Forces service; 5) a steady employment history; 6) community service; 7) property or business ties; 8) evidence attesting to good character; and 9) proof of genuine rehabilitation.

*Id.* (internal quotation marks omitted).

■ Garcia–Jurado claims that he would have been a good candidate for a § 212(c) waiver of deportation. Indeed, he would. Garcia–Jurado had lived here since he was a teenager. He has strong family ties in this country: a mother, stepfather and two half-sisters who are United States citizens. He also has two other siblings who are legal permanent residents, and, importantly, a daughter who is a citizen. He attended high school here, was employed for a year prior to his arrest. He also received a GED and vocational training in prison, and was employed as a machine operator after his release from prison up to the time he was deported. Garcia–Jurado has also submitted an affidavit by Bank, who represented him throughout the deportation process, claiming that in his experience representing over 75 aliens at § 212(c) hearings, aliens with equities similar to Garcia–Jurado were reasonably likely to receive § 212(c) relief. *See* Bank Aff. at ¶ 6.

As to adverse factors, other than the conviction itself, the government has not argued that any of the adverse factors weighed against Garcia–Jurado. *See Perez*, 330 F.3d at 102. Moreover, as the Supreme Court noted in *St. Cyr.*, "51.5% of the [§ 212(c) ] applications for which a final decision was reached between 1989 and 1995 were granted." 533 U.S. at 296 n. 5, 121 S.Ct. at 2277 n. 5 (" 'In the years immediately preceding [AEDPA]'s passage, over half the applications were granted.' ") (quoting *Mattis v. Reno*, 212 F.3d 31, 33 (1st Cir.2000)) (other citation omitted). Nothing in the record indicates that Garcia–Jurado's circumstances were such that would place him outside this statistical norm.

Garcia–Jurado has, therefore, shown that he was prejudiced by the deprivation of judicial review given that it was reasonable likely, and certainly plausible, that he would have received § 212(c) relief. Accordingly, Garcia–Jurado has shown that in addition to being deprived of an opportunity for judicial review, his deportation was fundamentally unfair.

### Conclusion

Because Garcia–Jurado's deportation was fundamentally unfair and deprived him of judicial review, the deportation cannot support a necessary element of the criminal charge of illegal reentry, 8 U.S.C. § 1326(a). The indictment is, therefore, dismissed.